UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

FIRST NATIONAL BANK IN MANITOWOC,

Plaintiff,

v. Case No. 03-C-241

THE CINCINNATI INSURANCE COMPANY,

Defendant.

**DECISION AND ORDER**

Lee Kust, a used car dealer who owned and operated West Town Auto in Manitowoc, was one of the largest customers of the First National Bank. On behalf of his dealership, he obtained a "lease line" of credit from the bank that was based on auto leases periodically entered into between West Town and its customers. Kust would negotiate a lease with a customer and then call or fax the bank to inform it of the lease's terms. If the bank found the terms acceptable, it would approve a loan to enable Kust to purchase the vehicle and then lease it to the customer. But the bank would disperse the funds to West Town only after Kust personally came to the bank and provided a pressure carbon copy of the signed leases and signed the loan paperwork himself.

Unfortunately for the bank, many of the leases Kust provided did not actually exist. On about 53 occasions, he simply drew up a lease for a non-existent car and forged a customer's signature on the lease by using carbon paper and tracing a real signature from another document. And, on approximately 111 occasions, Kust penned leases for cars that did exist but whose value was drastically overstated. For instance, Kust might alter the vehicle identification number (VIN)

or change a car's mileage and then forge a customer's signature onto the lease for that car. The bank alleges that its total losses resulting from its reliance on these forged leases amounted to nearly $2.2 million.

Luckily for the bank (or so it assumed) it had purchased insurance from The Cincinnati Insurance Company. By virtue of what is known as a bankers' blanket bond, Cincinnati provided coverage for losses stemming from forged and counterfeit documents. In particular, Insuring Agreement E, a standard form agreement in the banking business, provided coverage for:

> Loss by reason of the Insured (a) having in good faith and in the usual course of business . . . . extended any credit or assumed any liability or otherwise acted upon any security, document or other written instrument which proved to have been a forgery or to have been altered or raised or counterfeited or lost or stolen . . .

(PPFOF ¶ 33.) The agreement also provided that "[a]ctual physical possession of such security, document or other written instrument by the Insured . . . is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such security, document or other written instrument." (*Id.*)

First National Bank brought a claim under the bond based on its having acted upon documents (the auto leases) which proved to have been forged and/or counterfeited. Cincinnati denied coverage and now raises a number of defenses. It argues that the bank's lending practices with respect to West Town were sloppy and therefore neither "in the usual course of business" nor in "good faith". It also argues that the leases were neither counterfeits nor forgeries, and that even if they were the bank did not "act upon" those leases when it approved the loans to West Town. Further, it claims that the bank did not have "actual physical possession" of the leases–a precondition for coverage–because it had not the original documents but merely carbon copies.

Both parties have moved for summary judgment. The facts essential to liability are largely uncontested, although the facts related to the bank's damages are not. For the reasons given below, I find that coverage under the bond exists and that Cincinnati is therefore liable for the bank's losses; I conclude, however, that outstanding material issues of fact preclude a determination of the bank's damages at this point.

## ANALYSIS

Summary judgment is appropriate when there are no outstanding issues of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. In the usual insurance coverage case, interpretation of a policy favors the insured and doubts about the meaning of ambiguous contract terms are to be resolved in favor of coverage. But because the bankers blanket bond is an industry-standard policy, negotiated between parties of relatively equal bargaining power, the normal rules of insurance contract interpretation do not apply. *See Tri City Nat. Bank v. Federal Ins. Co.,* 674 N.W.2d 617, 621 (Wis. Ct. App. 2003). Instead, if terms prove ambiguous they are simply to be construed without a presumption in favor of either party by attempting to discern the intent of the parties when they agreed to be bound to the contract. With that in mind, I will proceed to address each of Cincinnati's defenses to coverage.

### 1. The bank acted upon the leases

As set forth above, the bond provides that "[a]ctual physical possession of such security, document or other written instrument by the Insured . . . is a condition precedent to the Insured's having relied on the faith of, or otherwise acted upon, such security, document or other written instrument." Cincinnati first argues that because the bank possessed only copies of the leases rather

than "wet ink" originals, it did not have "actual physical possession" of them. While conceding that the bond does not explicitly require "original" documents, Cincinnati argues that the originality requirement is implied by the language used in the physical possession precondition. Specifically, it highlights the fact that the agreement requires the bank to physically possess "such" document before it can claim it has relied on that document. The use of the word "such," it argues, is clearly referential to *the* actual document that was forged rather than a document with a carbon copied signature.

The bank protests that if the parties had actually agreed to an original document precondition the language would have been clearer. For instance, in *F.D.I.C. v. Fidelity and Deposit Co. of Maryland,* the agreement provided coverage for "loss resulting directly from the Insured having . . . acted upon, any *original* . . ." 827 F. Supp. 385, 391 (M.D. La.1993)(italics added). And, in *Citizens Banking Corp. v. Gulf Ins. Co.,* coverage existed for "direct loss resulting from the Insured having materially relied on any *original* Finance Documentation in the extension of credit." 2005 WL 1983248, *1 (E. D. Mich. 2005)(italics added). Thus, had the bond been intended to apply only to originals it could have easily been written to that effect.

I find Cincinnati's reliance on the word "such" to be unpersuasive, and certainly not sufficient to overcome the agreement's silence on the issue. In fact, it is clear that the agreement uses the word "such" simply because "such document" refers back to the "security, document or other written instrument" stated in the clause immediately prior. That antecedent clause lends itself to no inference of an originality requirement at all. Accordingly, I find no "wet ink" originality requirement in the bond. But even if I were to construe the bond as Cincinnati requests, the leases retained by the bank were the only "signed" copies in existence. Keep in mind that Kust forged

customers' names on the leases by placing carbon paper over the lease and then tracing the real signature from another document. If the term original is intended to mean the signed copy, the bank had possession of the only ones that existed.

Cincinnati also argues that because the bank approved many of the loans verbally before having "actual physical possession" of the leases at issue, it did not rely or act upon those documents when making the loans. Thus, its losses were not a result of the leases. Again, however, the plain language of the bond and the undisputed facts before me do not support Cincinnati's argument. It is true that bank employees may have verbally approved some or all of the loans prior to receiving the leases, but the bank did not disperse any funds to West Town until it did have actual physical possession of the leases, i.e., after Kust delivered them in person to the bank. Thus, the fact that it may already have verbally approved the loans does not mean the bank did not also "act upon" the leases when it issued the funds. If Cincinnati's view carried the day, the bond would impose a sole causation requirement on any injury sustained, such that coverage would exist only if the leases here were the *only* factor involved in the bank's issuance of the loans. But there is no language to that effect in the bond. Indeed, such a requirement would make little sense in this context because in the course of approving a loan a bank would typically rely upon a series of documents, events, verbal representations and other factors, any one of which could be said to have influenced the bank's action, even though none of them were the *exclusive* motivating force behind issuing the loan. The bond does not require exclusivity, but merely that the bank act upon a document that proves to have been forged or counterfeit. Since there is no question that receipt of the leases was one of the factors that the bank acted upon (when it dispersed the funds), Cincinnati's argument does not preclude liability under the bond.

**2. The bank acted in good faith and in the usual course of business**

Cincinnati's second line of argument is that the bank's general sloppiness and risk-taking mean that the losses it incurred are standard business losses rather than insurable losses stemming from dishonesty, forgery or counterfeit. For example, the bank never called any of the purported lessees to establish whether the leases were legitimate. And, for many of the vehicles at issue, the bank never received confirmation that its security interest was perfected. VINs in some of the bank's records did not correspond to the VINs in other records. The bank rarely knew the lessee's credit history, and many of the leases relied upon residual values that the bank knew to be too high. Because the bank could easily have investigated the legitimacy of the leases and discovered the fraud earlier, Cincinnati argues, it was acting neither in good faith nor in the usual course of business.

It is doubtful, however, that the requirement of good faith was intended to mean "good business practices." Good faith, in this context, is largely synonymous with arm's length and honesty. *See Black's Law Dictionary* (6th ed., 1990). In other words, the bank must have relied upon the document at issue without any inside knowledge of its falsity or any incentive to act on it knowing it was false. Good faith ensures that the loss is not deliberately incurred and therefore that when the insurer steps into the shoes of the insured, they are both standing on the same side of the loss. There is no dispute here that the bank was duped by Kust and did not deliberately seek to lose more than $2 million on the loans it issued. Nor is there any evidence of any knowledge on the bank's part that Kust was forging documents.

Cincinnati argues that there was a "veritable sea of red flags" that the bank ignored when it made the loans, which suggests it was not acting in good faith. *Marsh Investment Corp. v.*

*Langford,* 721 F.2d 1011, 1014 (5th Cir. 1983). But the "flags" Cincinnati cites are actually the bank's own business practices rather than any warning signs set off by West Town. Indeed, the contrast with *Langford* is stark. There, the court described the bank's bad faith thus:

> the bank, faced with an anomalous transaction that turned on the authority of one man--a poor credit risk, as it admitted--to mortgage the property of a corporation with which it knew he had little or no connection, and with the means of checking that authority lying as near as the closest telephone, failed in the face of what the trial court properly characterized as a veritable sea of red flags to lift a finger to verify that authority, choosing instead to proceed in ignorance and sole reliance on the debtor's critical representations about his own authority.

*Id.* Here, though the bank remained ignorant of the nature of West Town's fraud, there is no evidence that any red flags had gone off that would tip the bank off that the loans were either forged or counterfeit. Accordingly, I find that the bank acted in good faith.

Cincinnati makes a similar argument with respect to the "usual course of business" clause, claiming that the bank's negligence in failing to investigate the lessees and its somewhat casual relationship with Kust mean that its course of business was not, objectively speaking, "usual." "The Bankers Blanket Bond is designed to 'protect [a bank] against risks of dishonesty, both external and internal, but does not insure good management nor against the risk of loss inherent in the banking operations.'" *National City Bank of Minneapolis v. St. Paul Fire & Marine Ins. Co.,* 447 N.W.2d 171, 177 (Minn. 1989)(quoting 9A J. Appleman & J. Appleman, Insurance Law and Practice § 5701, at 380 (1981) (footnote omitted)). The bank counters that the clause is a subjective one: since its dealings with Kust were similar to how it usually went about its business, it was operating in its *own* usual course of business.

Whether the clause is subjective or objective, however, does not necessarily solve the problem. Accepting for the moment Cincinnati's view that the clause is of a more objective ilk, it

still does not follow that the usual course of business means "following generally accepted business standards" or that it imposes any kind of *normative* requirement on the bank. Cincinnati offers no cases to support its suggested interpretation. Instead, cases describe the "usual course of business" in other contexts as being descriptive of whatever actions happen to be within the bailiwick of what a bank's normal business entails. For instance, the cases speak of "a forger [who] . . . came to the plaintiff in the usual course of business, obtained a loan of $500 and pledged the stock as security." *Eliot Sav. Bank v. Aetna Cas. & Sur. Co.,* 38 N.E.2d 59, 60 (Mass. 1941). Or, "[i]n the usual course of business, [the bank] forwarded the check with the forged endorsement to Bankers Trust who paid it." *Bankers Trust of South Carolina v. South Carolina Nat. Bank of Charleston,* 325 S.E.2d 81, 83 (S. C. Ct. App. 1985). And the Wisconsin Supreme Court observed in one case that "[t]he check here was complete and regular on its face and, so far as the Elkhorn bank was concerned, it had no notice of any infirmity in it or any defect in the title of the person cashing it, and took it in the usual course of business." *Fidelity & Deposit Co. of Md. v. Peoples Exchange Bank of Thorp,* 270 Wis. 415, 417, 71 N.W.2d 290, 292 (Wis. 1955).

These cases are of course not dispositive because they are not construing Insuring Agreement E. Yet they all indicate that when one speaks of the "usual course of business" of a bank, one means merely that the action described is one, such as accepting a check, that is customarily and normally done by a bank. Applied here, the clause ensures that coverage exists only when the bank acts upon the kinds of documents that it would normally act upon in its business, such as leases, checks, securities, etc., rather than documents outside that usual course.

Thus, the "usual course of business" clause does not state that the bank must use a certain standard of care in deciding the creditworthiness of anyone whose liabilities underlie an extension

of credit; it does not say that the bank must investigate such individuals, nor that it make phone calls to verify information. All the bank must do is act upon a document in the usual course of business, and that is what First Bank did here. To the extent an insured's negligence rose to the level of gross negligence or knowing indifference to red flags raised about a document or customer, the bond's good faith requirement would preclude coverage. But such flags were not raised here. Accordingly, I find that the bank acted in good faith and in the usual course of business when it acted upon the leases presented by Kust.

**3. The agreement covers losses based on forged documents**

Forgery is defined by the bond as "the signing of the name of another with intent to deceive; it does not include the signing of one's own name with or without authority, in any capacity, for any purpose." (PPFOF ¶ 34.) There is no dispute here that the leases were forged by Kust. Instead, Cincinnati argues that no coverage exists because the bank's losses did not stem directly from the forged signatures per se, but from the fact that the information contained within the leases was simply fraudulent. That is, even if the signatures on the leases were real, the bank would have suffered the losses it claims because there were either no automobiles at all or the value of the automobiles at issue was vastly overstated.

There is some support for this distinction in the cases. For example, in *Georgia Bank & Trust v. Cincinnati Ins. Co.,* 538 S.E.2d 764 (2000), the Georgia Court of Appeals construed the exact clause at issue here. Georgia Bank & Trust had been defrauded when two customers assigned their interest in a credit union savings account to the bank. The customers had forged signatures of a credit union employee certifying that sufficient funds existed in that account when in truth there were no funds at all. The court found that the losses were not caused by the forgery because even

if the signatures were legitimate the loss would have been incurred: "[e]ven if the signature on the confirmation was authentic, the bank would have suffered the loss, because the assets did not exist." 538 S.E.2d at 766. *See also Jefferson Bank v. Progressive Cas. Ins. Co.,* 965 F.2d 1274, 1287 (3d Cir. 1992)(Roth, J., dissenting).

This argument also has some common sense appeal. If the bond is to provide coverage for reliance on documents that prove to have been forged, it makes sense that coverage would flow from losses caused by the forgery itself and not some other reason, such as the untruthfulness of the information in the forged document. When loss is caused because the documents themselves are simply untrue (in addition to being forged), the fact that they were also forged would not seem to create coverage.

The main problem with this argument is that it ignores the plain language of the agreement. To recall, the bond provides coverage for losses resulting from the bank's acting upon any "document or other written instrument which proved to have been a forgery or to have been altered or raised or counterfeited or lost or stolen." By its plain terms, coverage exists when a document proves to be a forgery; it does not require that the loss must *directly result* from the forgery per se. In contrast, for instance, Insuring Agreement D provides coverage for loss "resulting *directly* from (1) forgery . . . in any Negotiable Instrument" rather than loss from any negotiable instrument that proves to be forged. Had the bond been intended to provide coverage only for losses directly flowing from forgery, language to that effect would not have been difficult to envision.

The district court in *Pine Bluff National Bank v. St. Paul Mercury Ins. Co.* reached the same conclusion. 346 F. Supp.2d 1020 (E.D. Ark. 2004). There, the court found that the plain language of the agreement provided coverage when an insured acted upon a document that proved to be

forged. The court thus rejected the argument, accepted by the Georgia Court of Appeals in *Georgia Bank & Trust,* that the insured's loss needed to be caused by the forgery itself. I find the distinction compelling, and conclude that the bond's plain language provides coverage to the bank for its losses here. Though one might expect the loss to be directly linked to the forgery itself–which is not the case here–it is not unreasonable to conclude that coverage would exist any time a bank incurred losses from reliance on documents that were forged. Such documents, by virtue of the fact that someone sought to deceive the lender by forging a signature, could give rise to any number of injuries related to, even if not directly resulting from, that deception. Thus, I find that the fact the bank's losses did not result *directly* from the forgery itself is not fatal to coverage under Agreement E.

**4. Exclusion H does not apply**

Finally, Cincinnati makes what First Bank calls a conclusory argument that exclusion H should bar coverage. Exclusion H excludes coverage for "loss caused by an Employee . . ." Cincinnati argues that the bank's own employees caused the losses it incurred by failing to investigate West Town and verify its collateral. Given that I have rejected this negligence-based argument earlier in this opinion, it would make little sense to resurrect it now by virtue of a coverage exclusion. Moreover, reading the exclusion in the fashion Cincinnati suggests would graft a negligence qualifier not only onto the "good faith" and "usual course of business" clauses, but would also impose that requirement on the forgery clause itself. That is, Cincinnati's argument would mean that there would never be coverage for any forged documents because a bank's

employees, in accepting such documents without investigating the legitimacy of the signatures, would have "caused" the loss incurred by the bank. Such a reading cannot withstand scrutiny.[1]

**5. Damages**

As noted at the outset, the facts relevant to damages are disputed. First Bank claims its damages are approximately $2.2 million, resulting from $1.27 million lent based on completely fake leases as well as $933,000 for the fraudulently inflated or altered leases. Cincinnati states that the exhibit relied on by the bank "does not support" that amount. It also notes that the bank's 30(b)(6) witness stated that the bank's losses were detailed in its proof of loss to Cincinnati (when it filed its claim), which results in a somewhat lower damages figure.

First Bank concedes it did make a few computational errors in its initial submission, but it offers a new, corrected, total of $2,118,172.32. It also notes that even if it is limited to damages based on the original proof of loss exhibits it filed with Cincinnati in 2002, it is at least entitled to summary judgment in the amount of $1.773 million. In an apparent effort to clean up these discrepancies, First Bank filed an additional affidavit by one of its attorneys. Cincinnati has moved to strike the affidavit on multiple grounds. But, rather than decide an issue involving nearly $400,000 on the basis of undeveloped arguments and motions to strike, I will reserve ruling on the amount of damages sustained by First Bank. Cincinnati appears to concede that the damages are at least the $1.773 million originally claimed, but beyond that there is no agreement. Summary judgment on damages must therefore be denied. The parties will be directed to indicate to the court

[1]Though it did not move for summary judgment on the basis of Insuring Agreement D, First Bank argues, in response to Cincinnati's own motion, that Agreement D provides coverage. Because I find coverage under Agreement E, which was the focus of the parties' briefs, I need not address this issue. In addition, Cincinnati makes an argument that the leases were not counterfeits. But because I find them to be forgeries, I need not address that issue either.

within 21 days whether they can reach agreement on a proper damages figure or, if not, whether they wish to file a second round of summary judgment motions limited to that issue.

**6. Conclusion**

First Bank's motion for summary judgment is **GRANTED** in part and **DENIED** in part: it is granted to the extent that liability under Insuring Agreement E exists, but it is denied as to damages. Cincinnati Insurance Company's motion for summary judgment is **DENIED**. Cincinnati's motions to strike are **DENIED**. Counsel for the parties are directed to attempt to reach a settlement as to the proper total of First Bank's damages, and plaintiff's counsel is directed to notify the court in writing whether such settlement was reached, or whether a briefing schedule on that issue will be necessary.

**SO ORDERED.**

Dated this 5th day of October, 2005.

s/ William C. Griesbach
William C. Griesbach
United States District Judge